[Cite as *Long v. Mt. Carmel Health Sys.*, 2017-Ohio-5522.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Joseph Long, M.D., | : | |
| Plaintiff-Appellant, | : | |
| | | No. 16AP-511 |
| v. | : | (C.P.C. No. 13CV-11737) |
| Mount Carmel Health System, | : | (REGULAR CALENDAR) |
| Defendant-Appellee. | : | |

D E C I S I O N

Rendered on June 27, 2017

**On brief:** *Hammond Law Office*, *Gary W. Hammond*; *Butler Cincione & DiCuccio*, and *N. Gerald DiCuccio*, for appellant. **Argued:** *Gary W. Hammond*.

**On brief:** *Ice Miller LLP*, *Kris M. Dawley*, and *Robert J. Cochran*, for appellee. **Argued:** *Kris M. Dawley*.

APPEAL from the Franklin County Court of Common Pleas

LUPER SCHUSTER, J.

{¶ 1} Plaintiff-appellant, Joseph Long, M.D., appeals from a judgment of the Franklin County Court of Common Pleas granting summary judgment in favor of defendant-appellee, Mount Carmel Health System ("Mount Carmel"). For the following reasons, we affirm.

## I. Factual and Procedural History

{¶ 2} Mount Carmel owns and operates multiple hospitals in the Columbus area, including Mount Carmel West. On February 1, 2012, Mount Carmel contracted with Consultant Anesthesiologists, Inc. ("CAI"), a medical practice group, to provide professional anesthesiology services at Mount Carmel West (hereinafter the "Services Agreement"). The Services Agreement stated that all the anesthesiologists CAI selected to

practice at Mount Carmel West would be subject to Mount Carmel's approval, and that Mount Carmel approved all of the CAI anesthesiologists currently practicing at Mount Carmel West. Among those approved physicians was Long, an anesthesiologist who CAI employed under a contract. Long was a member of the Mount Carmel West medical staff and had privileges at Mount Carmel West. After Mount Carmel and CAI executed the Services Agreement, Long practiced anesthesiology at Mount Carmel West pursuant to that contract.

{¶ 3} In early April 2012, Mount Carmel removed Long from the Mount Carmel West campus. Melissa W. Fleming, assistant general counsel at Mount Carmel, explained Mount Carmel's reasons for removing Long in an April 5, 2012 letter to Brandi Kondracke, CAI's chief executive officer. Fleming stated:

> Sometime during the month of March 2012, Dr. Long took photographs on his cell phone of a Mount Carmel nursing employee, [A.M.],[1] in the OR while [A.M.] was bending over a patient on the OR table. Dr. Long then proceeded to send the photographs via text messaging to other members of your practice as well as show other Mount Carmel staff the photographs on his phone.
>
> In mid-March, * * * [another CAI anesthesiologist] showed [A.M. and another nurse] another picture of [A.M.] that had been texted to him by Dr. Long and this photograph showed [A.M.'s] side exposed as she reached over a patient.
>
> Both physicians were instructed by the Chairman of the Anesthesia Department as well as the Anesthesia Medical Director earlier this week to cease the behavior and have no further communications with [A.M.].
>
> * * *
>
> In addition, Dr. Long has been reported to have walked into an OR on April 3rd, and in front of everyone in the room, stated that he would have had a bad day if he had been assigned in the next OR because, "that bitch" (referring to [A.M.]) is in the other room. * * * [T]his retaliation creates an uncomfortable work environment for all of the staff in the OR which leads to potential compromise in patient safety;

---

[1] To protect the privacy of the nurse involved, we will refer to her by her initials rather than her name.

> therefore, Mount Carmel is removing Dr. Long effective immediately pending further investigation.

(Apr. 5, 2012 letter from Fleming to Kondracke, attached to Compl.)

{¶ 4}  Fleming also informed Kondracke that Mount Carmel had not yet completed its investigation into Long's actions.  Fleming requested a meeting with Kondracke to discuss the situation, and she promised to provide Kondracke with the results of Mount Carmel's investigation prior to the meeting.

{¶ 5}   Melissa Stacy-Cull, the director of surgical services at Mount Carmel West, investigated Long's conduct.  Stacy-Cull interviewed A.M., as well as other members of the nursing staff.  Stacy-Cull neither viewed the photographs at issue nor spoke with Long or the physician who received the photographs from Long.  At the conclusion of her investigation, Stacy-Cull drafted a report, dated April 11, 2012, that generally confirmed the conduct described in the April 5, 2012 letter.  Mount Carmel sent a copy of the report to Kondracke.

{¶ 6}   Mount Carmel representatives met with CAI representatives on April 13, 2012 to discuss Long.  Prior to the meeting, Sean McKibben, president and chief operating officer of Mount Carmel West, and Larry Swanner, vice president of medical affairs at Mount Carmel West, had decided to permanently bar Long from practicing at Mount Carmel West.  McKibben announced Mount Carmel's decision at the meeting. Thomas Englehart, CAI's then president, asked the Mount Carmel representatives to consider giving Long a second chance given the long length and high quality of Long's service at Mount Carmel West.  Mount Carmel declined.

{¶ 7}   Pursuant to Long's employment contract with CAI, Long was required to "devote his * * * full time and attention to the performance of professional services for" CAI and "be responsible for providing on call coverage."  (July 21, 2009 Employment Agreement at Section 3, attached to the Compl.)  Once Mount Carmel removed Long from Mount Carmel West, he could no longer perform those contractual duties.  Consequently, CAI terminated Long's employment agreement.

{¶ 8}   On October 24, 2013, Long filed suit against Mount Carmel, alleging claims for breach of contract and tortious interference with contract, and seeking a declaratory judgment.  In his complaint and amended complaint, Long asserted that Mount Carmel

failed to follow the process set forth in the Services Agreement regarding CAI physicians with alleged performance or behavior issues.   Section 4.2 of the Services Contract provided:

> (i) Should issues of performance or behavior with any of the Providers arise which, at the reasonable discretion of [Mount Carmel], affects the immediate safety of patients, staff or members of the Hospital's Medical Staff, or otherwise gives rise to a summary suspension action under the Medical Staff Bylaws, [Mount Carmel] shall immediately remove Provider from Hospital and provide written notice of such issues to Contractor and the affected Provider as set forth below in (iii) within twenty-four (24) hours of the removal (a "Provider Adverse Act").
>
> * * *
>
> (iii) If [Mount Carmel] believes a Provider Adverse Act has occurred, [Mount Carmel] shall provide Contractor and Provider with a written notice describing Hospitals' concerns in sufficient enough detail to enable Contractor and Provider to assess the gravity of the situation (the "Notice").   Such Notice shall be given within two (2) business days (within 24 hours if the Adverse Act arises under subsection (i)) of the day when the Hospital learns of the Provider Adverse Act.   Within two (2) business days of the Notice [Mount Carmel], Contractor and Provider (should Provider desire to do so) shall meet to review the pertinent information and discuss a resolution of [Mount Carmel]'s concerns (the "Meeting").   Prior to such Meeting, [Mount Carmel] shall provide Contractor and Provider with all reasonable information requested by such parties related to the alleged Provider Adverse Act.   Within 3 business days from the Meeting, Contractor's President, or his/her designee, a senior executive of [Mount Carmel] designated by [Mount Carmel] and Provider shall work to mutually resolve the issues caused by the Provider Adverse Act.   In the event the parties are unable to resolve the issues to the satisfaction of [Mount Carmel] within this time period, Contractor shall remove such Provider from providing the Services during further investigation which in all events shall be concluded within 30 days of the Meeting.   If at the end of the 30 days from the Meeting the issue is not resolved by mutual agreement, [Mount Carmel] will issue to Contractor a decision on whether

or not the Provider may return to Hospital(s) to provide Services.

(Feb. 1, 2012 Agreement for Anesthesia Services, attached to Mount Carmel's Mot. for Summ. Jgmt.)  Long alleged that Mount Carmel breached Section 4.2 when it failed to: (1) provide him with any notice, (2) include him in the April 13 meeting, and (3) work with him to mutually resolve the issues caused by his alleged misconduct.

{¶ 9}  Long also asserted in his complaint that Mount Carmel's actions breached the Medical Staff Bylaws, which are the rules, policies, and procedures governing the medical staff of Mount Carmel West.  Long alleged that the Medical Staff Bylaws entitled him to certain protections, including notice and a hearing, which Mount Carmel denied him.  Finally, with regard to his claim for tortious interference with contract, Long claimed that Mount Carmel's refusal to allow him to practice at Mount Carmel West improperly interfered with his employment contract with CAI.  Long contended that, due to Mount Carmel's decision to bar him from Mount Carmel West, he could not perform his duties under the employment contract and CAI terminated the contract.

{¶ 10}  After conducting discovery, both parties moved for summary judgment.  In a judgment dated June 17, 2016, the trial court granted Mount Carmel's motion and denied Long's motion. Long timely appeals.

## II.  Assignments of Error

{¶ 11}  Long assigns the following errors for our review:

[1.] The trial court erred in finding Dr. Long was not an intended third-party beneficiary of the Agreement for Anesthesia Services between CAI and [Mount Carmel].

[2.] The trial court erred in finding [Mount Carmel] did not breach the services agreement between CAI and [Mount Carmel].

[3.] The trial court erred in finding [Mount Carmel] did not violate Dr. Long's rights under the Bylaws (Ex[.] 9) by violating his rights under Ex[.] 2 (contract) and Ex[.] 10-5, HR procedures.

[4.] The trial court erred in finding [Mount Carmel] is entitled to Summary Judgment on Plaintiff's tortious interference with contract claim and in denying Plaintiff's Motion for Summary Judgment.

[5.] The trial court erred in finding [Mount Carmel] is entitled to Summary Judgment on Dr. Long's due process and equal protection claims.

[6.] The trial court erred in finding Dr. Long is not entitled to Declaratory Judgment.

[7.] The trial court erred in finding [Mount Carmel] is entitled to Summary Judgment on Plaintiff's malice and punitive damages claims.

## III. Discussion

{¶ 12} Each of Long's assignments of error challenge the trial court's ruling on the parties' motions for summary judgment. A trial court must grant summary judgment under Civ.R. 56 when the moving party demonstrates that (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion when viewing the evidence most strongly in favor of the nonmoving party, and that conclusion is adverse to the nonmoving party. *Hudson v. Petrosurance, Inc.*, 127 Ohio St.3d 54, 2010-Ohio-4505, ¶ 29; *Sinnott v. Aqua-Chem, Inc.*, 116 Ohio St.3d 158, 2007-Ohio-5584, ¶ 29. Appellate review of a trial court's ruling on a motion for summary judgment is de novo. *Hudson* at ¶ 29. This means that an appellate court conducts an independent review, without deference to the trial court's determination. *Zurz v. 770 W. Broad AGA, L.L.C.*, 192 Ohio App.3d 521, 2011-Ohio-832, ¶ 5 (10th Dist.); *White v. Westfall*, 183 Ohio App.3d 807, 2009-Ohio-4490, ¶ 6 (10th Dist.).

{¶ 13} The party moving for summary judgment bears the initial burden of informing the trial court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). The moving party does not discharge this initial burden under Civ.R. 56 by simply making conclusory allegations. *Id.* Rather, the moving party must affirmatively demonstrate by affidavit or other evidence allowed by Civ.R. 56(C) that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Id.* If the moving party meets its burden, then the nonmoving party has a reciprocal burden to set forth specific facts showing that there is a genuine issue for

trial.   Civ.R.   56(E);   *Dresher*   at   293.   If   the   nonmoving   party   does   not   so   respond, summary   judgment,   if   appropriate,   shall   be   entered   against   the   nonmoving   party. *Dresher* at 293.

### A.  First Assignment of Error – Third-Party Beneficiary

{¶ 14} By his first assignment of error, Long argues that the trial court erred in finding that he was not an intended third-party beneficiary to the Services Agreement between CAI and Mount Carmel.  We disagree.

{¶ 15} Generally, "only an intended beneficiary may exert rights to a contract of which he is not party."  *TRINOVA Corp. v. Pilkington Bros., P.L.C.*, 70 Ohio St.3d 271, 277 (1994); *accord Grant Thorton v. Windsor House, Inc.*, 57 Ohio St.3d 158, 161 (1991) ("Only a party to a contract or an intended third-party beneficiary of a contract may bring an action on a contract in Ohio.").  Here, Long seeks to sue Mount Carmel for breach of the Services Agreement.  Because Long is not a party to that contract, his ability to pursue such an action hinges on whether he is an intended third-party beneficiary to the contract.

{¶ 16} To determine whether a party is an intended third-party beneficiary, Ohio courts apply Section 302 of the Restatement (Second) of Contracts, which reads:

> (1)  Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either
>
> (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or
>
> (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.
>
> (2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

Restatement of the Law 2d, Contracts, Section 302 (1981).   *See Hill v. Sonitrol of Southwestern Ohio, Inc.*, 36 Ohio St.3d 36, 40 (1988) (adopting Section 302).  Thus, for a third party to acquire intended beneficiary status, it must present evidence that the promisee intended to directly benefit the third party.  *Huff v. FirstEnergy Corp.*, 130 Ohio St.3d 196, 2011-Ohio-5083, ¶ 11; *TRINOVA Corp.* at 277-78; *Hill* at 40.  A third party who

receives a mere happenstance benefit from the promisee's performance of a contract is only an incidental beneficiary, to whom the promisee owes no duty. *Hill* at 40.

{¶ 17} By beginning with the clause "unless otherwise agreed between promisor and promisee," Section 302 recognizes the contracting parties' right to come to a different agreement regarding who qualifies as an intended third-party beneficiary. Contracting parties may further limit who may sue under their contract by expressly "otherwise agree[ing]" to exclude all third parties from acquiring or invoking any rights under a contract. *Pennsylvania State Emps. Credit Union v. Fifth Third Bank*, 398 F.Supp.2d 317, 324 (M.D.Pa.2005), *rev'd on other grounds, sub nom. Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162 (3d Cir.2008). "This limitation on third-party-beneficiary rights makes sense because contracting parties should be able to control who may sue on the contract." *Id.* at 325. Thus, courts applying Section 302 honor contractual provisions that explicitly disclaim the creation of any third-party beneficiaries. *See LHPT Columbus The, LLC v. Capitol City Cardiology, Inc.*, 10th Dist. No. 14AP-264, 2014-Ohio-5247, ¶ 26; *Maghie & Savage, Inc. v. P.J. Dick Inc.*, 10th Dist. No. 08AP-487, 2009-Ohio-2164, ¶ 44, 46; *DVCC, Inc. v. Medical College*, 10th Dist. No. 05AP-237, 2006-Ohio-945, ¶ 52; *CMC Elec. Co., Inc. v. J.D. Williamson Constr. Co., Inc.*, 11th Dist. No. 98-A-0076 (Nov. 5, 1999); *Matheny v. Ohio Bancorp*, 11th Dist. No. 94-T-5022 (Dec. 30, 1994); *accord Inhabitants of Saco v. Gen. Elec. Co.*, 779 F.Supp. 186, 194 (D.Me.1991) ("Since [the contracting parties] unambiguously agreed that there would not be third-party beneficiaries to their contracts, the Restatement requires that the Court not undertake to find another contrary intent."); *RPC Liquidation v. Iowa Dept. of Transp.*, 717 N.W.2d 317, 320 (Iowa 2006) ("When a contract expressly negates the creation of third party beneficiaries, we have rejected the claim that such status exists."); *Riscorp, Inc. v. Norman*, 915 So.2d 1142, 1150 (Ala.2005) ("If two contracting parties *expressly provide* that some third party who will be benefitted by performance shall have *no legally enforceable right*, the courts should effectuate the express intent by denying the third party any direct remedy.") (Emphasis sic.) (Internal quotes omitted.)

{¶ 18} In the case at bar, Section 9.13 of the Services Contract states:

> No Third Party Beneficiaries. Nothing herein expressed or implied is intended or shall be construed to confer upon or

> give any person other than the parties hereto, and their permitted successors and assigns, any rights or remedies under or by reason of this Agreement.

(Feb. 1, 2012 Agreement for Anesthesia Services, attached to Mount Carmel's Mot. for Summ. Jgmt.)  Given the plainly expressed intent of this section, we conclude that the Services Agreement did not create any intended third-party beneficiaries.  Long, therefore, has no right to sue under the Services Agreement.[2]  Accordingly, we overrule Long's first assignment of error.

### B.  Second Assignment of Error – Services Agreement

{¶ 19} In his second assignment of error Long argues that the trial court erred in finding that Mount Carmel did not breach the Services Agreement.  Our conclusion that Long cannot sue for breach of the Services Agreement renders moot the question of whether Mount Carmel committed a breach of that contract.  Consequently, we find Long's second assignment of error moot.

### C.  Third Assignment of Error – Bylaws

{¶ 20} In his third assignment of error, Long argues that the trial court erred in finding that Mount Carmel did not violate Long's rights under the Medical Staff Bylaws. We disagree.

{¶ 21} As we stated above, the Bylaws are the rules, policies, and procedures governing the medical staff of Mount Carmel West.  The Bylaws specify the process for taking corrective action against, suspending, or terminating a medical staff member's appointment and/or privileges.  Additionally, pursuant to the Bylaws, the medical executive committee may adopt, with the approval of Mount Carmel's board, policies to implement the general principals set forth in the Bylaws and for proper conduct of the medical staff.  Long argues that Mount Carmel violated his rights under the Bylaws when it did not follow one such policy, entitled "Disruptive Behavior," when responding to his alleged misconduct.  Long also argues that Mount Carmel violated his rights under the Bylaws when it failed to comply with the process set forth in Section 4.2 of the Services Agreement.

---

[2] We do not find persuasive Long's argument that he may sue under the Services Agreement because he is CAI's assignee.  Long points to no evidence supporting his alleged assignee status.

{¶ 22} On appeal, Long focuses on establishing that the alleged Bylaws violations actually occurred. Long, however, fails to point to any law that transforms the provisions of the Bylaws into legally protectable rights. If Mount Carmel owes Long no legal obligation to comply with the Bylaws, then Long cannot recover in a court of law for their violation. *See Alley v. Wendy's Internatl., Inc.*, 107 Ohio App.3d 810, 816 (1st Dist.1995) (holding that "it is * * * imbedded in civil law as administered in Ohio" that a party cannot recover for loss or damage without the violation of a legal right).

{¶ 23} Arguably, the Bylaws could form a contract between Mount Carmel and the medical staff, thus giving Long contractual rights and the ability to recover for violation of those rights via a claim for breach of contract. The Bylaws, however, provide:

> **Not a Contract**:    These Bylaws are not intended to and shall not create any contractual rights between the Hospital and any Practitioner. Any and all contracts of association or employment shall control contractual and financial relationships between the Hospital and such Practitioners.

(Mount Carmel East/West Medical Staff Bylaws, attached to the Compl.) Consequently, the Bylaws expressly preclude Long from acquiring or asserting any contractual rights by virtue of its provisions. *See Moore v. Rubin*, 11th Dist. No. 2001-T-0150, 2004-Ohio-5013, ¶ 33 (upholding the grant of summary judgment on a physician's claim for breach of contract because the defendant medical system's bylaws disavowed any intent to create a binding contract between the physician and the medical system and, thus, did not do so); *see also Shepard v. Griffin Servs., Inc.*, 2d Dist. No. 19032, 2002-Ohio-2283, ¶ 62 (holding that provisions in an employee handbook disclaiming an intent to create a contract "negate any inference of contractual obligations between the parties" based on the handbook provisions).

{¶ 24} Consequently, we conclude that the trial court did not err in finding that Mount Carmel did not violate Long's rights under the Bylaws, and we overrule Long's third assignment of error.

### D.  Fourth Assignment of Error – Tortious Interference with Contract

{¶ 25} By his fourth assignment of error, Long argues that the trial court erred in: (1) granting Mount Carmel summary judgment on his claim for tortious interference with

contract, and (2) denying him summary judgment on that claim.  This assignment of error lacks merit.

{¶ 26} The tort of intentional interference with contract occurs "when a person, without a privilege to do so, induces or otherwise purposely causes a third person * * * not to perform a contract with another."  *A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 73 Ohio St.3d 1, 14 (1995).  To prove a claim of tortious interference with contract, a plaintiff must establish (1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) lack of justification, and (5) resulting damages.  *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 85 Ohio St.3d 171 (1999), paragraph one of the syllabus. "Establishment of the fourth element of the tort of tortious interference with contract, lack of justification, requires proof that the defendant's interference with another's contract was improper."  *Id.* at paragraph two of the syllabus.  The Supreme Court of Ohio has directed courts that are determining whether interference was "improper" to consider the factors set forth in Restatement of the Law 2d, Torts, Section 767 (1979).[3]  *Fred Siegel Co.* at paragraph three of the syllabus.

{¶ 27} Under this framework, Ohio law places the burden on the plaintiff to demonstrate improper conduct in order to prevail on a claim of tortious interference with a contract instead of requiring a defendant to assert and prove privilege in defense of such a claim.  *Columbia Dev. Corp. v. Krohn*, 1st Dist. No. C1300842, 2014-Ohio-5607, ¶ 25 ("Ohio law places the burden of proving a lack of privilege or justification upon the plaintiff.").

{¶ 28} Here, the trial court, citing *Walter v. ADT Sec. Sys., Inc.,* 10th Dist. No. 06AP-115, 2007-Ohio-3324, determined that because Mount Carmel's act of excluding Long from its campus was within the context of its business relationship with CAI, it is entitled to a qualified privilege.  The trial court then analyzed whether Long can demonstrate clear and convincing evidence of "actual malice" to overcome the existence of

---

[3] Those factors are: "(a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d)  the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties."

the qualified privilege of the alleged tortfeasor.  *See Gentile v. Turkoly*, 7th Dist. No. 16 MA 0071, 2017-Ohio-1018, ¶ 25 (plaintiff asserting tortious interference with contract must show actual malice to defeat qualified privilege).  In effect, the trial court determined that Mount Carmel's conduct could not be found as improper unless it was malicious.  Finding no evidence of actual malice, the trial court determined Mount Carmel is entitled to judgment as a matter of law as to Long's tortious interference with contract claim.

{¶ 29} Long presents no argument directly challenging the trial court's determination that Mount Carmel cannot be liable for the interference in the absence of evidence that Mount Carmel acted with actual malice in interfering with Long's contract with CAI.  In tortious interference cases involving qualified privilege, "actual malice" has been defined as acting with knowledge that the statements are false or acting with reckless disregard as to their truth or falsity.  *Miller v. J.B. Hunt Transp., Inc.*, 10th Dist. No. 13AP-162, 2013-Ohio-3892, ¶ 27, citing *A & B-Abell Elevator Co., Inc.* at 11-12.  In this context, it has also been stated that "[i]nherent in the concept of actual malice is the notion that a wrongful act has been done without any plausible legal justification." (Citation omitted.)  *Ament v. Reassure Am. Life Ins. Co.*, 180 Ohio App.3d 440, 2009-Ohio-36, ¶ 63 (8th Dist.).  Although Long argues he has presented evidence that Mount Carmel acted maliciously and therefore should be held liable for its interference with his contract with CAI, he does not challenge the underlying facts that indisputably formed the basis of Mount Carmel excluding him from its campus.  Furthermore, considering Long derived no legal rights under Mount Carmel's contract with CAI, we are unpersuaded by his assertion that Mount Carmel acted maliciously by not providing him notice and a hearing under that contract before reaching its final decision to exclude him from Mount Carmel West.  Because Long cannot demonstrate that Mount Carmel acted maliciously, the trial court did not err in its disposition of his tortious interference with contract claim.

{¶ 30} Accordingly, we overrule Long's fourth assignment of error.

### E.  Sixth Assignment of Error – Declaratory Judgment

{¶ 31} We next turn to Long's sixth assignment of error, by which he argues that the trial court erred in denying him a declaratory judgment that Mount Carmel violated his contractual rights under the Services Agreement and the Medical Staff Bylaws.  As we

have explained above, Long has no contractual rights under the Services Agreement or the Bylaws. Accordingly, we conclude that the trial court did not err in denying him a declaratory judgment stating the opposite, and thus, we overrule Long's sixth assignment of error.

### F. Fifth and Seventh Assignments of Error

{¶ 32} As a final matter, we must address Long's fifth and seventh assignments of error, which he did not argue separately in his brief. On appeal, the party asserting error bears the burden of affirmatively demonstrating that such error exists. *Deutsche Bank Natl. Trust Co. v. Sopp*, 10th Dist. No. 14AP-343, 2016-Ohio-1402, ¶ 6. The appellant, therefore, has the duty to construct legal arguments supporting the assignments of error. *Id.*; *Cook v. Ohio Dept. of Job & Family Servs.*, 10th Dist. No. 14AP-852, 2015-Ohio-4966, ¶ 40. If an appellant fails to fulfill its duty, the appellate court may disregard the unsupported assignment of error. App.R. 12(A)(2). Here, because Long did not separately argue his fifth or seventh assignments of error, we will not review those assignments of error. Rather, we simply overrule them.

## IV. Disposition

{¶ 33} For the foregoing reasons, we overrule Long's first, third, fourth, fifth, sixth, and seventh assignments of error. Our decision to overrule Long's first assignment of error renders moot Long's second assignment of error. Accordingly, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

HORTON, J., concurs.
KLATT, J., concurs in part and dissents in part.

KLATT, J., concurring in part and dissenting in part.

{¶ 34} I concur with all sections of the majority decision except for the section addressing Long's claim for intentional interference with contract. I respectfully dissent from that section because I believe the majority's analysis contravenes binding precedent from the Supreme Court of Ohio.

{¶ 35} Traditionally, to prove tortious interference with contract, a plaintiff merely had to establish intentional interference. 3 Dobbs, Hayden, & Bublick, *The Law of Torts*,

Section 620, at 510 (2d Ed.2011).  The defendant, then, "could escape liability only by showing a privilege and shouldering the burden of justifying the interference."  *Id.*; *accord Juhasz v. Quik Shops, Inc.*, 55 Ohio App.2d 51, 56-58 (9th Dist.1977).  When recognizing the tort of intentional interference with contract, the Supreme Court of Ohio structured the tort differently.  The court allocated to the plaintiff the burden to prove "lack of justification," thus removing from the defendant the burden to plead or prove a privilege in order to avoid liability.  *Kenty v. Transamerica Premium Ins. Co.*, 72 Ohio St.3d 415 (1995), paragraph two of the syllabus.  Later, in expanding upon *Kenty*, the Supreme Court clarified that, to show a lack of justification, the plaintiff had to prove that the defendant's interference was improper.  *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 85 Ohio St.3d 171 (1999), paragraph two of the syllabus.  Determining whether a defendant has acted improperly requires consideration of the factors set forth in Section 767 of the Restatement (Second) of Torts.  *Id.* at 178.  Those factors are:

> (a)  the nature of the actor's conduct,
>
> (b)  the actor's motive,
>
> (c)  the interests of the other with which the actor's conduct interferes,
>
> (d)  the interests sought to be advanced by the actor,
>
> (e)  the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
>
> (f)  the proximity or remoteness of the actor's conduct to the interference and
>
> (g)  the relations between the parties.

Restatement of the Law 2d, Torts, Section 767 (1979).

{¶ 36} Importantly, the factors now used to determine whether a defendant has engaged in improper conduct largely mirror those considerations previously used to decide whether a defendant's conduct was privileged.  *Compare* Restatement of the Law, Torts, Factors in Determining Privilege, Section 767 *to* Restatement of the Law 2d, Torts, Factors in Determining Whether Interference Is Improper, Section 767.  This is logical, as

contemporary law has merely switched the burden of pleading and proving justification from the defendant, who once had the burden of establishing a privilege, to the plaintiff, who now has the burden of showing improper conduct. Although the burden shifted, the considerations underlying it remain the same.

{¶ 37} In shaping the tort of intentional interference with contract, the Supreme Court did not ignore the specific, established qualified privileges, such a fair competition, that developed under the traditional construction of the tort. Rather, the Supreme Court accommodated and continued certain former qualified privileges, which are set out in Sections 768 to 773 of the Restatement (Second) of Torts. Where a defendant's conduct falls within the one of the special situations dealt with in Sections 768 to 773, a factfinder need not balance the factors set forth in Section 767 to determine if the conduct is improper. *Fred Siegel* at 179. Instead, "[t]he specific applications in [Sections 768 to 773] [ ] supplant the generalization expressed in [Section 767]." Restatement, Section 767, Comment a.[4]

{¶ 38} Unfortunately, in Ohio, the evolution of the tort of intentional interference with contract has not proceeded smoothly. In *Kenty* and *Fred Siegel*, the Supreme Court endorsed the modern construction of the tort, which makes consideration of justification (or the lack thereof) a prima facie element. However, in the period between the issuance of *Kenty* and *Fred Siegel*, the Supreme Court of Ohio appeared to revert to the traditional privilege formulation of the tort. *A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 73 Ohio St.3d 1, 14 (1995) (stating that the tort of interference with contract occurs "when a person, without a privilege to do so, induces or otherwise purposely causes a third person * * * not to perform a contract with another"). Confusingly, *A & B-Abell* did not mention, much less overrule, *Kenty*. When the Supreme Court subsequently decided *Fred Siegel*, it affirmed and followed *Kenty* without distinguishing or overruling *A & B-Abell*.

{¶ 39} As the most recent Supreme Court decision addressing the tort of intentional interference with contract, *Fred Siegel* remains the prevailing law in Ohio

---

[4] None of these sections are relevant to this case because no party has claimed that any of the sections apply. The qualified privilege that Mount Carmel asserts does not fit within any of the specific applications set forth in Sections 768 to 773.

today.  *See State v. Thomas*, 8th Dist. No. 103406, 2016-Ohio-8326, ¶ 12 ("[W]hen Supreme Court cases are in apparent conflict, the court of appeals is bound by the Supreme Court's most recent decision, regardless of its previous decision.").  The majority decision, however, applies the formulation of the tort laid out in *A & B-Abell*.  Under that formulation, to avoid liability, the defendant must raise a qualified privilege, which the plaintiff may overcome by showing that the defendant acted with actual malice.  *A & B-Abell* at 14.  "Actual malice" is defined as "an unjustified or improper interference."[5] *Walter v. ADT Sec. Sys, Inc.*, 10th Dist. No. 06AP-115, 2007-Ohio-3324, ¶ 33 (defining "actual malice" in the context of a claim for intentional interference with a business relationship).  Thus, in the majority decision, justification is not a prima facie element of the tort, but rather, part of the privilege analysis.  Application of this formulation of the tort contravenes *Fred Siegel*.

{¶ 40}  I would sustain Long's fourth assignment of error and reverse the trial court's decision because the trial court failed to apply the tort as *Fred Siegel* has formulated it.  The trial court concluded that Mount Carmel's actions were not improper without acknowledging, much less considering, the necessary factors.  A determination of whether the alleged interference is improper requires "an appraisal of the several factors and an evaluation of their comparative weight."  Restatement, Section 767, Comment a.  Thus, a trial court errs if it grants summary judgment without considering each of the factors set forth in Section 767.[6] *Paramount Farms Internatl., LLC v. Ventilex B.V.*, 12th Dist. No. CA2015-02-029, 2016-Ohio-1150, ¶ 40.  For this reason, I respectfully concur in part and dissent in part.

---

[5] In *A & B-Abell*, the Supreme Court defined "actual malice" as "knowledge of falsity or reckless disregard for the truth."  *Id.* at 15.  This definition makes sense only where the interference at issue consists of allegedly defamatory words, as was the case in *A & B-Abell*.  When the interference consists of actions, not words, the definition set forth above applies.

[6] There is an exception to this rule:  where a defendant's conduct falls within one of the special situations dealt with in Sections 768 to 773 of the Restatement, a trial court need not balance the factors set forth in Section 767 when deciding whether to grant summary judgment.  *Fred Siegel Co.* at 179; Restatement, Section 767, Comment a.  This exception is not relevant to this case because, as I stated above, no party has asserted that any of the more specific sections apply.